222 P.3d 979

KOGA ENGINEERING & CONSTRUC-
TION, INC., Respondent & Peti-
tioner/Plaintiff–Appellee

v.

STATE of Hawai'i, Petitioner &
Respondent/Defendant–
Appellant.

No. 28278.

Supreme Court of Hawai'i.

Jan. 14, 2010.

Rebecca A. Copeland, Deputy Solicitor General (Mark J. Bennett, Attorney General, Glenn I. Kimura, Michael Q.Y. Lau, and Sonia Faust, Deputy Attorneys General on the briefs; Mark J. Bennett, Attorney General, Dorothy Sellers, Solicitor General, and Rebecca A. Copeland, Deputy Solicitor General, on the application), for the State of Hawai'i.

Bert T. Kobayashi, Jr. (Ronald T. Ogomori, Nathan Yoshimoto, and Brendan S. Bailey on the brief; Bert T. Kobayashi, Jr., Christopher T. Kobayashi and Maria Y. Wang on the application and response) of Kobayashi Sugita & Goda, Honolulu, for Koga Engineering & Construction, Inc.

MOON, C.J, NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge KIM in place of RECKTENWALD, J., Recused.

Opinion of the Court by ACOBA, J.

On July 8, 2009, both Petitioner & Respondent/Defendant–Appellant State of Hawai'i (the State) and Respondent & Petitioner/Plaintiff–Appellee Koga Engineering & Construction, Inc. (Koga) filed separate Applications for Writ of Certiorari,[1] requesting that this court review the judgment of the Intermediate Court of Appeals (the ICA) filed pursuant to its March 13, 2009 Summary Disposition Order (SDO)[2] affirming in part and reversing in part the October 24, 2006 final judgment of the circuit court of the first circuit (the court).[3] *See Koga Eng'g & Const., Inc. v. State*, No. 28278, 2009 WL 641461, *1 (Haw.App. Mar. 13, 2009). On July 23, 2009, Koga filed a Response to the State's Application (Koga's Response), and on the same day, the State filed a Response to Koga's Application (State's Response). On August 27, 2009, Koga filed a supplemental memorandum as requested by this court's order filed on August 12, 2009. This court held oral argument on October 13, 2009.

Briefly, this case involved a construction contract dispute. The court denied the State's motion for summary judgment on the ground that Koga's claim for damages was untimely, but granted Koga's motion for partial summary judgment to the effect that its late claim for damages was not barred under the contract. The case proceeded to a bench trial on the issue of damages. The court *inter alia* concluded Koga was entitled to damages and payment of that part of the contract price retained because of incomplete work. The court issued final judgment in favor of Koga. On appeal, the ICA affirmed the court's final judgment, except as to the portion regarding retainage. Part I of this opinion relates the relevant facts in this case. Part II addresses the State's Application, which asserts that the ICA gravely erred in upholding the court's denial of its motion for summary judgment. Part III addresses Koga's Application, which maintains that the ICA erred in reversing the court's final judgment on the retainage issue. As to Part II, we hold that the court was wrong in granting Koga's motion for partial summary judgment but right in denying the State's motion for summary judgment, inasmuch as there were genuine issues of material fact as to the question of prejudice. The case with respect to damages is remanded for trial. As to Part III, we hold that the court lacked jurisdiction to consider the retainage fee, inasmuch as the retainage claim must be processed through HRS chapter 103D as noted herein.

1. Pursuant to Hawai'i Revised Statutes (HRS) § 602–59 (Supp.2008), a party may appeal the decision of the intermediate appellate court (the ICA) only by an application to this court for a writ of certiorari. *See* HRS § 602–59(a). In determining whether to accept or reject the application for writ of certiorari, this court reviews the ICA decision for:

 (1) Grave errors of law or of fact; or
 (2) Obvious inconsistencies in the decision of the [ICA] with that of the supreme court, federal decisions, or its own decision,

and the magnitude of those errors or inconsistencies dictating the need for further appeal. HRS § 602–59(b). The grant or denial of a petition for certiorari is discretionary with this court. *See* HRS § 602–59(a).

2. The SDO was filed by Presiding Judge Daniel R. Foley and Associate Judges Alexa D.M. Fujise and Katherine Leonard.

3. The Honorable Victoria S. Marks presided.

### PART I

### I.

### A.

### 1.

On July 18, 1997, Koga entered into a contract[4] with the State to widen a road in Hilo, Hawai'i (the Project).[5] In relevant part, the contract provided as follows with respect to damages:[6]

105.18 Claims for Adjustment and Disputes. *The Contractor may give notice in writing to the Engineer for claims that extra compensation, damages, or an extension of time for completion is due the Contractor for one or more of the following reasons:*

(1) Requirements not clearly covered in the contract, or not ordered by the Engineer as an extra work;

(2) Failure between the State and the Contractor to an adjustment in price for a contract change order issued by the State;

(3) *An action or omission on the part of the Engineer requiring performance changes within the scope of the contract.*

The Contractor shall continue with performance of the contract in compliance with the directions or orders of the Engineer, but by so doing, *the Contractor shall not be deemed to have prejudiced any claim for additional compensation, damages, or an extension of time for completion, provided:*

(1) *The notice in writing be given:*

(a) *Before the commencement of the work involved, if at that time the Contractor knows of such requirements or the occurrence of such act or omission;* or

(b) *Within 30 calendar days after the Contractor knows of such requirements or the occurrence of such action or omission if the Contractor did not have such knowledge before the commencement of the work;* or

(c) Within 30 calendar days after receipt of the written contract change order that was not agreed upon by both parties; or

(d) *Within such further time as may be allowed by the Engineer in writing.*

(2) The notice shall clearly state the Contractor's intention to make claim and the reasons why the Contractor believes that additional compensation changes or an extension of time may be remedies to which the Contractor is entitled; and afford the Engineer every facility for the keeping of records of the actual cost of work. *Failure on the part of the Contractor to give such notification or to afford the Engineer proper facilities for keeping strict account of actual cost shall constitute waiver of the claim for such extra compensation.* The filing of such notice by the Contractor and the keeping of the costs by the Engineer shall not in any way be construed to prove the validity of the claim.

The Engineer will review the notice and render a decision. The Engineer's decision shall be final and conclusive unless, within 30 calendar days from the date of the decision, the Contractor mails or otherwise furnishes a written appeal to the Director. The decision of the Director shall be final. *Later notification of such claims shall not bar the Contractor's claim unless the State is prejudiced by the delay in notification.* No claim by the Contractor for an adjustment hereunder shall be allowed if notice is not given before final payment under this contract. Any adjust-

---

**4.** The contract consisted of several documents, including a document entitled "Standard Specifications For Road, Bridge, and Public Works Construction 1994," (Standard Specifications) and a document entitled "Special Provisions Proposal Contract and Bond 1997" (Special Provisions). The Special Provisions, which were signed by both parties, contained amendments to certain sections of the Standard Specifications, including section 105.18, which is relevant to this case. It is undisputed that section 105.18 of the Special Provisions controls in this case. Col-

lectively, these documents will be referred to as "the contract."

**5.** As discussed further *infra,* this case proceeded to a bench trial after the court denied the State's motion for summary judgment. The court made findings of fact (findings), and some of facts related herein are based on the uncontested findings of the court at trial.

**6.** More specific facts with respect to the retainage issue are recounted in Part III.

ment in the contract price pursuant this clause shall be determined according to Subsection 104.09—Price Adjustment.

(Emphases added.)

Based on plans provided by the State, Koga prepared an "Original Project Schedule" which called for completion of the work in three phases, known as Phases I, II, and III. As part of the work, Koga was required to install a "drain line." The Original Project Schedule called for "the installation of a waterline" in Phase II of the Project, but not in Phase I. On September 8, 1997, the State issued a letter to Koga stating that it was "hereby given notice to proceed as of September 15, 1997, and to complete the project on or before December 2, 1998 [ (First Notice to Proceed) ]."

According to the State, "[t]he controversy arose as a result of an error in the State's construction plans." On September 8, 1997, "prior to the commencement of its work on the Project," Koga discovered a "discrepancy" in the plans between the "proposed installation of the new drain line" and an existing waterline. The existing waterline, which lay "in the exact location where the new drain line was to be installed" and "ran for nearly the entire length of Phase I[,]" was not shown on the State's plans. During "the first week of October 1997," "Koga commenced with work on the water system in Phase II[.]"

As a result of the discrepancy, the existing waterline needed to be relocated, and on October 20, 1997, Koga "submitt[ed] a cost proposal [7] to relocate the existing [ ] waterline" in Phase I. In its cost proposal, Koga stated that "[t]he total cost [to relocate the existing waterline] amounts to [$363,587]." To the cost proposal, Koga attached a "breakdown" from which the total amount was derived. The breakdown contained categories for "quantity," "new unit price," and "total this item," which was obtained by mul-

tiplying the quantity and new unit price. There was no category for "labor," or any other costs.

The amount in the cost proposal was "incorporated directly into" a change order, known as Change Order No. 5, authorizing Koga to commence work on relocating the existing waterline. On February 26, 1998, "[f]unding for Change Order No. 5 work was approved and the State issued its Notice to Proceed [ (Second Notice to Proceed) ] on the waterline work in Phase I[.]" Change Order No. 5 was executed by Koga on March 8, 1998. In the meantime, Koga had been working on other phases of the project. On April 15, 1998, the State and Koga agreed to a contract amendment (Contract Amendment No. 1) that increased the total contract price to reflect "Contract Change Orders" issued by the State, as well as "other overruns." On August 6, 1999, the State and Koga agreed to a second contract amendment (Contract Amendment No. 2) for the same reasons. It is not clear whether these amendments included a change in price as a result of Change Order No. 5.

On March 24, 2000, Koga submitted a "claim for additional compensation" to the State ("Claim"). In regard to notice, Koga's Claim stated that "[f]rom about March 8, 1998 to May 26, 1999, [ ] Koga had repeatedly put the State on notice of the damages to Koga which had not yet been quantified and which were directly caused by the unanticipated discovery of the [waterline]." [8] As to written notice, Koga stated that "on May 26, 1999, Clay Asato of Koga provided written notice to Howard Haymore of [the State (May 26, 1999 Asato letter) ] that Koga would be submitting a claim for equitable adjustment to the State[.]" [9] Koga argued that it was entitled to extra compensation and damages for three reasons: (1) the State's plans were inaccurate, which caused a change in the design and scope of work, (2) the State

---

7. In its Answering Brief, Koga pointed out that the court found that in the deposition of Salvador Panem (Panem), the Project Engineer for the Department of Transportation, "he admitted that there was nothing in Koga's cost proposal ... that indicated that indirect costs and indirect impacts from delay and disruptions was included in Koga's cost proposal."

8. Koga argued that Change Order No. 5 "provided no payment for the costs of overhead, labor, material and utilities[.]"

9. The May 26, 1999 Asato letter does not appear to be part of the record in this case.

failed to grant double shifts and night work, and (3) the State's suspension of work due to unsuitable weather was unjustified. Koga claimed that it was due extra compensation and damages in the amount of $1,138,043. Rather than setting forth a specific amount in regard to each reason in its Claim, Koga used a "'total cost' method" because, *inter alia,* its "[s]pecific costs [were] impossible or extremely impracticable to ascertain[.]"

### 2.

On September 1, 2000, the State, in a decision by Hawai'i District Engineer Stanley Tamura (the Engineer), denied Koga's Claim (the Engineer's Denial). In relevant part, in the Engineer's Denial, the Engineer rejected Koga's Claim as to Koga's first reason on the merits as follows:

> The plans are not improper in that it states that the location of the existing waterline is approximate. Also, the State did not suspend contract work at any time.
>
> The "original" schedule, which was submitted on or about September 4, 1997, was not formally reviewed by the State. The Notice to Proceed [10] is not contingent on review of the schedule. Prior to the final review of the "original" schedule, the existing 18″ waterline was located and *Koga's project personnel agreed that starting work on Phase II instead of Phase I would not impact their work.* Koga then resubmitted [its] schedule showing [its] agreement to start on the Phase II work. This schedule was "Reviewed" by the State on November 14, 1997. *No mention of a claim was made at this time.*
>
> *Contract Change Order No. 5 addresses all costs (direct and indirect) for relocating the existing waterline. Indirect costs are customarily included in the unit or lump prices for each contract and extra work item. Therefore, Koga was compensated for indirect costs.* Furthermore, Koga was compensated for additional costs. The unit price to install the extra work 18″ waterline is 14.8% more than the

contract unit price for almost identical 18″ waterline work.

> Based on the above, we feel Koga's [C]laim is not justified.

(Emphases added.) As to Koga's second and third reasons, the Engineer also addressed them on their merits, stating that (1) "[t]he State is not obligated to approve double shifts or night work[,]" and (2) Koga was "given the opportunity to 'standby' until the weather cleared." In his analysis of Koga's second and third reasons for receiving damages, the Engineer made no reference to any failure on the part of Koga to provide notice to the State.

On September 29, 2000, Koga appealed the Engineer's decision to the Department of Transportation. In regard to the statement in the Engineer's Denial that "[n]o mention of a claim was made at this time," Koga argued that the State did in fact have notice of Koga's Claim:

> In [the Engineer's Denial], [the Engineer] stated that "No formal mention of a claim was made" at or around the time the State reviewed the revised schedule by Koga (November of 1997). *Thus, the State is seemingly raising Koga's apparent failure to provide written notice of its claim as an affirmative defense.* As discussed more fully below, Koga's apparent failure within the time period provided for written notice should be excused as: (1) *the State was orally advised of the basis of Koga's claim and therefore had actual notice of Koga's claim;*[11] and (2) *the State was not prejudiced* by Koga's alleged failure to provide written notice.
>
> . . . .
>
> *Assuming arguendo that [the May 26, 1999] letter did not satisfy the written notice requirement of Section 105.18 of the [contract],* the pertinent facts . . . indicate that the State had actual knowledge of the circumstances that form the basis of

---

**10.** It is not clear whether the Engineer was referring to the First or Second Notice to Proceed.

**11.** Koga has not argued that it actually orally advised the State that it was going to bring a

claim. Rather, it argues that it "orally advised the State of the basis of Koga's claim," *i.e.,* it told the State that the plans were inaccurate.

Koga's claim and/or were [sic] *not preju-diced by the lack of notice.*

(Emphases added.)

On June 29, 2001, Deputy Director Jadine Urasaki (the Director) denied Koga's appeal. On the issue of notice, the Director stated in relevant part as follows:

*Koga never submitted any contemporane-ous written notice of a claim* on account of the potential disruption or potential impact due to the problems with relocating the [ ] waterline[.]

. . . .

On the failure to provide written notice, Koga seeks to get out of the contract's notice requirements by alleging that notice was excused because: (1) oral notice was given; and (2) the State was not preju-diced by the lack of written notice.

*The claim letter basically admits at page 12 that written notice of a potential claim was not provided to the State until May 26, 1999.* Note that this is the first time Koga mentions any written notice to the [S]tate on all three claim items—the waterline discovery, failure to approve night work, and suspensions due to inclem-ent weather.

Koga's discussion of the facts surround-ing the supposed oral notice . . . only serves to show that the State was aware of the facts of the waterline discovery and that some of the work had to be rese-quenced. *It shows no notice of a claim.* In addition, it shows no notice of any dis-satisfaction, much less a claim, due to deni-al of extra shifts or due to suspensions on account of inclement weather.

. . . .

*Furthermore, the State did not have ac-tual notice of a potential claim due to the waterline. To the contrary, Koga was im-parting to the State that there would be no claim. The schedule was redone and re-submitted without notice of a claim. Change Order No. 5 was negotiated and executed without notice of a claim. Since*

*these events took place well after the dis-covery of the waterline location problem, one would think that by that time Koga would have some idea that there would be a claim—yet it said nothing.* In addition, the appeal letter is completely silent on alleged actual notice of a claim situation surrounding denial of extra work or sus-pensions due to weather.

(Emphases added.) The Director also ad-dressed the merits of the arguments raised in Koga's appeal of the Engineer's Denial, concluding that no basis for granting Koga's request for increased compensation and dam-ages was shown.

### B.

### 1.

On December 26, 2001, Koga filed its Com-plaint against the State. Koga alleged sever-al counts in its Complaint, including that the State had breached the contract by "fail[ing] to compensate Koga for its increased costs . . . as a result of the defective Project plans" and that the State had "breach[ed a] duty of cooperation" by "refus[ing] Koga's reason-able request to mitigate the effects of the defective Project plans by working double shifts." Koga stated that "[t]he modified total cost for the Project . . . is $1,543,889.00."

### 2.

### a.

On August 22, 2003, the State filed a mo-tion for summary judgment, arguing that "[t]here [was] no dispute that [Koga] failed to provide the notice required by the contract." Referencing section 105.18 ¶ 2(1)(b) of the contract, the State claimed that "[t]here is no question that [Koga] did not submit any writ-ten claim for additional compensation within 30 days of the waterline discovery." [12] Ac-cording to the State, Koga had acknowledged in its March 24, 2000 claim that its claim was untimely "by claiming that it provided [the

---

12. In a footnote, the State asserted that "[i]t is eminently arguable that section 105.18[¶ 2](1)(a) of the contract, which provides that notice must be given '[b]efore the commencement of the work involved,' should be applied[.]" According

to the State, "even giving [Koga] the benefit of the doubt . . . and allowing [it] the 30 day period, there is no question that [Koga] failed to comply with the notice requirements."

State] with 'oral and actual notice[,]' " and that "even if the State had oral and actual notice that an existing waterline was not shown in the plans, this is not the same . . . as receiving notice of [Koga's] intent to file a claim for additional . . . compensation."

The State also argued that Koga's "failure to comply with the contract's notice provisions . . . caused severe prejudice to the State" because "the State could have explored alternatives" or "monitor[ed] the costs that [Koga] would claim as its damages[ ] as the work progressed." The State acknowledged that Koga had raised "a need to work double shifts" in its Complaint, but the State made no separate argument about notice in regard to this claim.

b.

On September 22, 2003, Koga filed a memorandum in opposition to the State's motion for summary judgment (Koga's memorandum in opposition) in which it presented several arguments. In relevant part, Koga claimed that because the State denied the March 24, 2000 claim "on the merits and did not expressly reserve the right to rely upon Koga's failure to provide timely written notice in defending against Koga's claim for additional compensation, the State effectively waived any failure on the part of Koga to provide prompt written notice."

Additionally, Koga maintained that the State was not prejudiced because "the State was aware of the facts supporting Koga's claim for additional compensation[,]" "Change Order No. 5 was restricted to direct costs and cannot be construed as constituting a waiver of Koga's [March 24, 2000] claim," and the State had breached the contract by providing inaccurate plans. Koga did not separately address any of the reasons for extra compensation and damages that it had provided in its March 24, 2000 claim.

3.

a.

On August 26, 2003, Koga filed a motion for partial summary judgment which sub-

stantially tracked its memorandum in opposition. As to whether it had complied with the contract's written notice requirements, Koga stated that "[i]n the present case, the State was provided with written notice of Koga's claim in Clay Asato's letter dated May 26, 1999."

Although Koga argued that the May 26, 1999 Asato letter "would satisfy the written notice requirement as provided in Section 105.18 of the Standard Specifications[,]" [13] it did not argue that the May 26, 1999 Asato letter had been received within the deadlines set forth in the contract. Koga asserted that "[a]ssuming arguendo that [the May 26, 1999 Asato] letter did not satisfy the written notice requirement of [s]ection 105.18 of the Standard Specifications, Koga may argue that its apparent failure to provide notice within the specified time period should be excused" because "the State had actual and constructive notice of the additional work and was not prejudiced by the delay[.]"

b.

On September 22, 2003, the State filed a memorandum in opposition to Koga's motion for partial summary judgment (State's memorandum in opposition). As to Koga's assertion that the Asato letter satisfied the written notice requirement, the State noted that the Asato letter was not included by Koga as an exhibit, and that "there [was] no question that the letter was untimely." The State also separately addressed all three of the reasons provided by Koga in its Claim. In regard to each reason, the State utilized the May 26, 1999 Asato letter as the "earliest" date of "[Koga's] claim." As to the inaccurate plans, the State argued that "[t]he inaccuracy of the State's plans was discovered by Koga on September 8, 1997. . . . If [Koga] wanted to make a claim for additional compensation because of a defect in the plan, [it] was required to provide notice of the claim by October 8, 1997." [14]

---

13. Although Koga uses the term "Standard Specifications," it is assumed that it is referring to the contract, inasmuch as section 105.18 of the Standard Specifications does not control in this case.

14. As to the State's refusal to allow Koga to work double shifts, the State maintained that Koga's last request to work double shifts was submitted on "October 28, 1998. . . . Accordingly, if [Koga]

The State also argued that "[t]here [was] no showing why the State should be charged with actual notice of a claim. The state representatives on the job were never informed prior to May 1999, either orally or in writing, that Koga was incurring additional delay and impact costs." Finally, the State argued that it had been "prejudiced by the lack of timely notice[,]" and that it had not breached the contract as alleged by Koga.

c.

On September 25, 2003, Koga filed a reply to the State's memorandum in opposition (Koga's reply). In substantial part, Koga reiterated the arguments made in its motion for summary judgment and memorandum in opposition. Koga did not address the individual arguments made by the State in regard to the waiver of the three reasons for additional compensation and damages set forth in its Claim.

4.

On October 15, 2003, the court issued an order denying the State's motion for summary judgment and an order granting Koga's motion for partial summary judgment (collectively, "the Summary Judgment Order"). In relevant part, the court stated that the State had waived the written notice requirement and was not prejudiced by the failure to provide timely written notice:

> In denying the State's Motion for Summary Judgment, the [c]ourt recognizes the well settled rule that a contractor's *failure to comply with the written notice requirement is hereby waived if the contracting officer and the head of the awarding department considers and denies a contractor's claims on its merits* without raising the issue of the contractor's failure to provide prompt written notice as a basis for the denial of the claim.
>
> *In regards to Koga's [C]laim dated March 24, 2000 . . ., the [c]ourt hereby finds that the State failed to base its deni-*

*al of Koga's Claim dated September 1, 2000 on Koga's failure to provide timely written notice.* Accordingly, the *[c]ourt hereby finds that the State waived any failure on the part of Koga to comply with the written notice* requirement when it analyzed and reached a decision upon Koga's [C]laim on its merits.

> Additionally, the [c]ourt hereby finds that any failure on the part of Koga to provide written notice of its claim for additional compensation is excused as the State was aware of the underlying facts relating to Koga's Claim *and was not prejudiced by Koga's alleged failure to provide written notice.*

(Emphases added.) (Citations omitted.)

C.

On January 31, 2006, a bench trial began on Koga's Complaint regarding the issues of damages and retainage. On May 15, 2006, the court issued its Findings of Fact, Conclusions of Law and Order. The court ruled that Koga was entitled to damages in the amount of $704,963.55 and retainage in the amount of $145,250. In pertinent part, the court made the following findings:

*KOGA SHARES RESPONSIBILITY FOR INCREASED PROJECT COSTS AND LOST PRODUCTIVITY*

. . . .

297. *Koga failed to impress upon the State* that the denial of the night work: (1) adversely impacted Koga's work schedule; (2) that the night work was necessary to mitigate the impact of relocating the waterline in Phase I; or (3) *that Koga would be making claim for additional money as a result of the denial of the nigh work request.*

298. Koga failed to anticipate all of the indirect costs that would be associated with Change Order No. 5 and failed to

wanted to make a claim for additional compensation as a result of the State's denial of the double shift request, the claim for the last request should have been filed by November 27, 1998." In regard to the State's suspension of work due to weather, the State argued that this reason was "no longer at issue. [Koga] has adopted the report of Herbert Chock [ (Chock) ] to itemize it [sic] damages. . . . [ (Chock) ] testified that he was not challenging any of the [S]tate [sic] determinations regarding the weather delays."

adequately inform the State that it was experiencing such costs. *As a result, the State was unable to keep strict account of the actual costs incurred by Koga.*

. . . .

### UNPAID RETAINAGE

301. The original total contract amount for the Project was $5,809,991.87.

302. *The State has not paid Koga the retention for the Project, which totals $145,250.00.*

. . . .

303. *Koga should be paid its retainage because Koga completed the requirements of the [c]ontract.*

(Emphases added.)

In pertinent part, the court made the following conclusions:

### KOGA'S DAMAGES

146. Pursuant to [Chock's] expert report, Koga's damages are comprised of: (a) the increased costs and lost productivity damages sustained by Koga on the Project; (b) delay damages or extended overhead damages; (c) bond charges; and (d) taxes.

. . . .

### JURY VERDICT METHOD OF DETERMINING DAMAGES

. . . .

161. In this case, [Chock] opinied [sic] that *Koga's total damages, which included direct and indirect costs, amounted to $1,409,927.10.* [15] *However, the court believes that Koga shares responsibilities for these additional costs* because it failed to adequately monitor its costs and because it failed to adequately manage this project. Consequently, the court concludes that

15. In an August 1, 2001 report prepared by Chock detailing the alleged damages incurred by Koga, Chock concluded that "Koga experienced an increase in its direct costs (i.e. labor, material, subcontract equipment, and other miscellaneous costs) totaling $1,173,411.50." Chock also found that Koga suffered an "unrealized profit" of $119,965, an "increase in indirect costs due to [] delay" in the amount of $92,417, and a "loss

*Koga shares responsibility for the additional costs of the project by 50%.* Thus, damages are awarded to Koga and against the State in the amount of $704,963.55.

### KOGA IS ENTITLED TO THE PAYMENT OF THE UNPAID RETAINAGE

162. *Since October 1, 1999, Koga has substantially completed the Project,* and the State has had full use of the Project.

. . . .

165. *Nowhere in his Declaration does [ ] Panem testify that as of the date of the trial, the punchlist items were not complete.*

166. In contrast, [ ] Sakaitini testified at trial that Koga "completed the requirements of the contract and we should be able to collect the retainage."

. . . .

168. Even the $82,487.89 in retention that the State admits should be paid to Koga has not been paid.

. . . .

171. *The [c]ourt hereby awards Koga its full retention of $145,250.*

. . . .

### ORDER

. . . .

B. The [c]ourt hereby awards damages totaling $704,963.55 in favor of Koga and against the State[.]

(Emphases added.)

On July 13, 2006, the court granted Koga's motion to amend the Findings of Fact, Conclusions of Law and Order to include the retainage amount in the court's damage amount. Accordingly, "[t]he damage award . . . in the amount of $704,963.55 [was]

of opportunity to mitigate delay costs due to the denial of adding an additional shift" in the amount of $88,977 (this appears to be an "indirect cost"). Adding overhead, fees, and tax to his amounts, Chock arrived at a total amount of $1,534,889.90. It is not clear why this amount differs from the amount attributed to Chock in the court's conclusion no. 161.

amended to add the retainage amount of $145,250.00 for a total damage award of $850,213.55[.]"

## II.

### A.

In its SDO, the ICA determined that "[t]he [court] did not err in granting Koga's [m]otion for [p]artial [summary judgment] ... on the notice issue" because "[t]he State waived the notice requirement when the State decided Koga's claim ... on its merits without reference to the notice requirement." *Koga*, 2009 WL 641461, at *2. The ICA relied on two cases cited by the court in its Order, *Charles Thompson & George K. Thompson, CoPartners, Trading as Charles & George K. Thompson v. United States*, 91 Ct.Cl. 166, 1940 WL 4139 (1940) and *W.E. Callahan Construction Co. v. United States*, 91 Ct.Cl. 538, 1940 WL 4060 (1940). The ICA did not address the issue of whether the State was prejudiced by Koga's late notice.

### B.

In regard to the retainage issue, the ICA held that "[conclusions no.] 169 and no. 171 are wrong"[16] and that the court erred in granting Koga's claim for retainage because such a claim had not been made in Koga's complaint:

> The [court] erred by finding that the State breached the [c]ontract by failing to pay Koga its retainage and by including the State's retainage in its damages award because *in the Complaint, Koga failed to assert a claim for retainage and cite to the [c]ontract provision the State allegedly breached by failing to pay the retainage.* *Otani v. State Farm Fire & Cas. Co.*, 927 F.Supp. 1330, 1335–36 (D.Haw.1996); *Au v. Au*, 63 Haw. 210, 221, 626 P.2d 173, 181 (1981); *Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*, 115 Hawai'i 201, 216 n. 17, 166 P.3d 961, 976 n. 17 (2007).

*Koga*, 2009 WL 641461, at *6. Ultimately, the ICA affirmed the court's final judgment "ex-

cept for that portion of the damages award, interest, and attorney's fees that include Koga's retainage, which is reversed[,]" and "remanded [the case] to the [court] to calculate the amount of damages, interest, and attorney's fees." *Id.* at *7.

### PART II

### I.

The State lists the following question in its Application: "Whether the [ICA] gravely erred by holding that the [court] did not err in granting [Koga's] motion for partial summary judgment and denying the [State's] motion for summary judgment." In support of this claim, the State presents two arguments: "1. The State did not waive the contractual requirement that Koga provide notice of its claim for additional compensation[ and] 2. Koga's claim is contractually barred because Koga's failure to give the State timely notice of the claim prejudiced the State." (Formatting altered.) The State's Application does not address any of the other holdings reached by the ICA.

### II.

As to the first argument, the State maintains that (1) the notice requirement was not waived because "on September 1, 2000, the Engineer denied [Koga's claim] and specifically stated '[n]o mention of a claim' was made by Koga after the 18–inch waterline was discovered and Koga submitted its revised schedule[ ]" (some brackets in original), (2) in Koga's appeal "to [the Director], Koga acknowledged that the Engineer relied on Koga's lack of timely notice of claim in rendering his decision[,]" and (3) "in rejecting Koga's Claim, [the Director] cited, among other reasons, Koga's failure to provide timely written notice of claim." The State argues that the ICA gravely erred because it "ignored the uncontroverted summary judgment evidence showing the State denied Koga's claim based, in part, on late notice[.]"

---

16. In conclusion no. 169, the court concluded that "[t]he [c]ourt hereby rejects the State's argument that Koga should not be paid its retention."

In conclusion no. 171, the court concluded that "[t]he [c]ourt hereby awards Koga its full retention of $145,250."

## III.

In regard to the second argument, as noted *supra,* the court found "that any failure on the part of Koga to provide written notice ... is excused as the State was aware of the underlying facts relating to Koga's [c]laim and was not prejudiced by Koga's alleged failure to provide written notice." The State claims that "even if [it] waived the notice requirement," it did suffer prejudice as a result of "Koga's untimely notice[,]" as stated in declarations made by Panem.

The State also maintains that it was prejudiced because (1) "Koga's untimely notice foreclosed any opportunity for the State to" consider construction alternatives, or monitor actual costs, (citing *Mingus Constructors, Inc. v. United States,* 10 Cl.Ct. 173, 178 (1986)); (2) the fact that it had "knowledge of the underlying circumstances does not eradicate the existence of prejudice and its impact on the survival of Koga's claim[ ]" (citing *Eggers v. United States,* 185 Ct.Cl. 765, 403 F.2d 225, 233–34 (1968)); (3) "[e]ven if [it] had knowledge of the [waterline] problem, [it] did not have notice that Koga would submit a claim seeking additional costs above and beyond those agreed to in Change Order No. 5[ ]"; and (4) the ICA's reliance on *Thompson* and *Callahan* was "erroneous[ ]" because "neither of the contracts at issue in [those cases] had a prejudice clause like the one in the contract between Koga and the [S]tate."

## IV.

In its Answering Brief, Koga relied on the cases cited by the court's Order in arguing that "[a]s clearly demonstrated by the express language," the Engineer's Denial "did not cite to or rely on Koga's failure to comply with the written notice requirement as one of the basis [sic] of [its denial] and did not include a reference to the written notice provision [of the contract]." Koga also argued

in part that "no prejudice exists where the Government has been 'intimately aware of the underlying facts, including the fact that additional costs were being incurred, from the outset.' *Appeal of Precision Tool and Engin. Corp.,* [No. 14148, 1971 WL 1590, 1971 ASBCA Lexis 135, *1](1971)." Additionally, Koga asserted that the State's reliance on the court's findings that the State was prejudiced was "misplaced, as this evidence was not before [the court] at the time [the court] ruled on Koga's [motion for summary judgment], and therefore cannot be considered on appeal."

## V.

In its Reply Brief (Reply), the State claimed that (1) "the lack of notice was raised by [the Engineer] in [the Engineer's Denial]" (2) "there is a serious question whether the older federal cases [cited by Koga in support of its waiver argument] are still valid[ ]" (citing *Schnip Bldg. Co. v. United States,* 227 Ct.Cl. 148, 645 F.2d 950, 959 (1981)),[17] (3) "even under those older federal cases ..., there must also be a showing that the government was not prejudiced by the contractor's late submission of claim." Additionally, the State argued that based on *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.,* 177 F.3d 351, 356 (5th Cir.1999), the State's knowledge of the facts underlying Koga's Claim did not relieve Koga from complying with the notice provisions.

In regard to Koga's argument on prejudice, the State asserted that evidence of prejudice was before the court in the form of Panem's declarations when it ruled on the motions for summary judgment. According to the State, "Koga did not present anything ... to rebut the State's prejudice claim. As such, ... the court's finding of prejudice was reversible error."

**17.** Although *Schnip* decided that the government had not waived the notice requirement of the contract despite the fact that the contracting officer had considered the claim on the merits, it does not appear that the relevant contract provision in *Schnip* provided the contracting officer with the authority to extend the time in which a contractor could file a claim. 645 F.2d at 954

(noting that the contract "stated in mandatory language: that the contractor 'shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing' if unexpected subsurface conditions were encountered ... and that 'No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required' ").

## VI.

With respect to the argument that the State waived the notice requirement, Koga's Response substantially repeats the arguments made by Koga in its Answering Brief. As to the State's claim that it was prejudiced, Koga's Response asserts (1) that *Mingus* and *Eggers* are distinguishable on their facts; (2) that the State "does not dispute the [court's] finding that the State was aware of the underlying circumstances for Koga's claim" demonstrates that the State was not prejudiced; and (3) based on Panem's admissions under oath, "Change Order No. 5 did not settle Koga's [c]laims for indirect impacts" or "bar Koga from submitting additional claims[.]"

## VII.

■ This court has stated that " '[a]s a general rule, the construction and legal effect to be given a contract is a question of law.' " *Found. Int'l, Inc. v. E.T. Ige Const., Inc.*, 102 Hawai'i 487, 494–95, 78 P.3d 23, 30–31 (2003) (quoting *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984)). Accordingly, "[a]bsent an ambiguity, [the] contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Id.* at 495, 78 P.3d 23 (brackets in original, citation omitted).

■ In this case, the contract requires notice to be given in four instances.[18] In its motion for summary judgment, the State argued that Koga did not provide written notice within the time set forth in subsections (a) or (b) of section 105.18 ¶ 2(1). Koga has not argued that it provided notice within the subsections set forth in section 105.18 ¶ 2(1), or that a particular subsection applies in this case.

■ Additionally, section 105.18 ¶ 2(2) of the contract establishes that a contractor waives its claim for extra compensation in two circumstances: by (1) failing to give notification as to any of the four subsections in section 105.18 ¶ 2(1),[19] or (2) failing "to afford the Engineer proper facilities for keeping strict account of actual cost[.]" The State has not asserted a "failure" on Koga's part "to afford the Engineer proper facilities for keeping strict account of actual cost" as an independent ground for denying Koga's Claim.[20] Rather, the State argues that under section 105.18 ¶ 3 of the contract it was prejudiced because Koga's untimely notice prevented it from "monitor[ing] the actual costs ... Koga incurred on a daily basis in order to confirm Koga's claimed additional costs." [21]

Under section 105.18 ¶ 3 of the contract, "[t]he Engineer will review the notice and render a decision." In this case, there is no

18. To reiterate, section 105.18 ¶ 2(1) of the contract requires that notice in writing be given: (a) Before the commencement of the work involved, if at that time the Contractor knows of such requirements or the occurrence of such act or omission; or (b) Within 30 calendar days after the Contractor knows of such requirements or the occurrence of such action or omission if the Contractor did not have such knowledge before the commencement of the work; or (c) Within 30 calendar days after receipt of the written contract change order that was not agreed upon by both parties; or (d) Within such further time as may be allowed by the Engineer in writing. (Emphasis added.)

19. The term "such notification" in section 105.18 ¶ 2(2) is seemingly ambiguous, because it does not indicate whether it relates to (1) the failure to give notice altogether, (2) the failure to include what is required in the notice, such as "the Contractor's intention to make a claim and

the reasons why the Contractor believes that additional compensation ... may be remedies[,]" or (3) the failure to give timely notice under section 105.18 ¶ 2(1). Ambiguities in a contract are construed against the drafter. *See Found. Int'l, Inc.*, 102 Hawai'i at 498, 78 P.3d at 34 (quoting *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed.Cir.1997)).

20. Assuming that ambiguity exists as to whether a contractor's "failure to afford proper facilities" is subject to a "prejudice" qualification as set forth for "later notification," again, "[a]mbiguities in a government contract are normally resolved against the drafter." *Found. Int'l, Inc.*, 102 Hawai'i at 498, 78 P.3d at 34 (quoting *Triax Pac., Inc.*, 130 F.3d at 1475).

21. In a footnote, the State asserted that "[i]n fact, section 105.18 of the contract required Koga 'to afford the Engineer every facility for keeping records of the actual cost of work.' " The State did not elaborate on this assertion.

dispute that Koga failed to provide timely written notice to the State of its Claim under any of the four subsections of section 105.18 ¶ 2(1).[22] As to section 105.18 ¶ 2(1)(d) there was no written allowance for "further time" given by the Engineer to Koga to file a notice. However, as stated in section 105.18 ¶ 3, "[l]ater notification of such claims shall *not* bar the Contractor's claim unless the State is prejudiced by the delay in notification." (Emphasis added.) This provision in effect qualifies the notice requirements under section 105.18 ¶ 2(1)(a)-(d). Under section 108.15 ¶ 3, although Koga provided "later notification," its Claim was not barred *unless* the State was prejudiced by the delay in notice. Presumably then, notice filed *within* the time limits in section 105.18 ¶ 2(1) would not be subject to "prejudice" objections by the State as set forth in section 105.18 ¶ 3.

## VIII.

As discussed above, Koga, the court, and the ICA relied on *Thompson* and *Callahan* for the proposition that "[t]he State waived the notice requirement when [it] decided Koga's [Claim] on its merits without reference to the notice requirement."[23] *Koga*, 2009 WL 641461, at *2. In *Thompson*, the plaintiffs brought a claim for extra compensation after the deadline to bring such a claim had passed. 91 Ct.Cl. 166, 1940 WL 4139, at *7. This claim was denied by the contracting officer on its merits. Article 3, the relevant contract provision in *Thompson*, stated that "[a]ny claim for adjustment . . . must be asserted within ten days from the date the change is ordered, *unless the contracting officer shall for proper cause extend such time*[.]" *Id.* at *8 (emphasis added).

The Court of Claims held that the contracting officer had waived the contract's notice requirement, stating that the plaintiffs' claim would have been barred and out of time had not the contracting officer entertained it, passed upon it, denied it, and informed plaintiffs that they could appeal to the Secretary of the Interior. Under Article 3 of the contract which provided for the changes, *the contracting officer had the right to extend the time in which to assert a claim for adjustment of the change order, and therefore, when the request of the plaintiffs was received and acted upon, the 10-day provision was waived by the contracting officer and the time extended within which to take an appeal.* *Id.* at *9 (emphasis added).

*Callahan* presented the same factual situation as that in *Thompson*, and contained identical contractual language. 91 Ct.Cl. 538, 1940 WL 4060, at *47. Citing *Thompson*, the Court of Claims held that "the contracting officer did not reject any of them on that ground but considered and decided them on the merits. By so doing he waived the 10-day provision. The contracting officer was expressly authorized to extend the time." *Id.* at *46.

The ICA concluded that this case was "[l]ike *Thompson* and *Callahan*." *Id.* at *5. However, it appears that neither Koga, the court, nor the ICA examined the specific contract language of section 105.18 to determine whether the waiver analysis in *Thompson* and *Callahan* was germane to this case. Those cases are not controlling, in light of the express language of the instant contract.

First, under the "later notification" provision, the contract provides that late notifica-

**22.** As noted *supra*, in its Claim, Koga stated that it "provided written notice to" the State in the form of the May 26, 1999 Asato letter. However, Koga does not claim that this letter was provided within the time requirements in section 105.18 ¶ 2(1) of the contract.

**23.** According to Koga, "[i]t is widely recognized in Hawai'i that a condition precedent to a contract, like formal notice provisions, can be waived[ ] by the party for whom the notice was to benefit." (Citing *Scotella v. Osgood*, 4 Haw. App. 20, 659 P.2d 73 (1983); *Hing Bo Gum v. Nakamura*, 57 Haw. 39, 43–44, 549 P.2d 471, 475–76 (1976)). Koga is correct that both *Scotel-*

*la* and *Hing Bo Gum* stand for the above proposition. *See Scotella*, 4 Haw.App. at 23, 659 P.2d at 75 (stating that "a condition precedent may be waived by a party to a contract 'if it is solely for his benefit' " (quoting *Hing Bo Gum*, 57 Haw. at 44, 549 P.2d at 475)). However, in both of those cases, which involved contracts for the sale of land between private parties, the party for whom the condition was to benefit specifically argued that it was waiving the condition. But that situation is factually different from the one here, where the party purportedly benefitting from the condition is arguing that it has not been waived.

tion of claims is not barred unless prejudice is visited on the State, apparently without respect to whether the late claim was considered on the merits or not. Hence, even if a contractor's claim is late, it will only be rejected if the State has been prejudiced by the delay in notification. By contrast, insofar as the contractual language is recited in the *Thompson* and *Callahan* opinions, neither case contained express provisions in their contracts that would allow a "later" claim to be brought. Thus, under the subject contract it is immaterial whether a claim has been considered on its merits or denied for lack of timeliness, because no late claim will be barred unless it causes prejudice to the State.

Second, in *Thompson* and *Callahan*, the relevant contractual provision stated that "[a]ny claim for adjustment under this article must be asserted within ten days from the date the change is ordered[.]" *Thompson*, 91 Ct.Cl. 166, 1940 WL 4139, at *8; *Callahan*, 91 Ct.Cl. 538, 1940 WL 4060, at *26. Unlike those cases, in this case, the contract states that the notice in writing must be given "[w]ithin such further time as may be *allowed by the Engineer in writing*." (Emphasis added.) Therefore, in order for the Engineer to allow further time, he or she must do so in writing, which seemingly would incorporate a requirement that the contractor file its claim by a date certain.

In *Thompson* and *Callahan* on the other hand, the contracts did not specify that the Engineer's decision to extend the time needed to be in writing. *See Thompson*, 91 Ct.Cl. 166, 1940 WL 4139, at *8 (contract stated that "[a]ny claim for adjustment under this article must be asserted within ten days from the date the change is ordered, unless the contracting officer shall for proper cause extend such time"); *Callahan*, 91 Ct.Cl. 538, 1940 WL 4060, at *47 (same). Thus, the fact that *Thompson* and *Callahan* treated the contracting officer's consideration of an untimely claim on the merits as extending the time in which to file a claim is inapplicable here.

In this case, any extension of time to bring the Claim had to be granted in writing by the Engineer, and therefore, a writing was required to allow further time to file the claim. Furthermore, unlike the contracts in *Thompson* and *Callahan*, the contract here expressly permits "later notification." [24] The rationale that consideration of the merits of a claim by the government waived the contractual time limits in *Thompson* and *Callahan* would be inconsistent with an express provision allowing for "later notification."

Finally, neither *Thompson* nor *Callahan* indicated the contracts in those cases barred a contractor's claim if the government was prejudiced by the delay in notification. It does not appear, under the language of the contracts in *Thompson* and *Callahan*, that the Court of Claims was required to consider whether a claim brought after the time requirements in the contract caused prejudice to the government. In this case, however, the "later notification" provision allows untimely claims "unless the State is prejudiced by the delay in notification." Therefore, unlike in *Thompson* and *Callahan*, the court was bound to consider whether prejudice existed.

Koga and the court also relied on *Appeal of Robertson–Henry Co.*, 61–2 B.C.A. (CCH) ¶ 3156, *Fox Valley Engineering v. United States*, 151 Ct.Cl. 228 (1960), *Appeal of General Excavating Co.*, 60–2 B.C.A. (CCH) ¶ 2771, and *Palumbo v. United States*, 125 Ct.Cl. 678, 113 F.Supp. 450 (1953), for the same proposition. However, these cases are distinguishable, either because, like *Thompson* and *Callahan*, the language of the contracts in those cases is different from the contract in this case, or because the relevant contractual language was not discussed. These cases are not dispositive because the case at bar is controlled by specific contractual provisions.

## IX.

■ Here, it is undisputed that Koga provided "later notification" of its claim, whether the Engineer considered the claim on its merits or not. Because Koga's claim falls

---

**24.** Although *Thompson* and *Callahan* did not set forth the complete language of the contracts at issue, nothing in those cases indicated that a contractor could provide "later notification."

within the "later notification" provision of the contract, it must be determined whether the State was prejudiced by the delay. Prejudice is defined as "[d]amage or detriment to one's legal rights or claims." *Black's Law Dictionary* 1218 (8th ed.2004). Whether or not the government has been prejudiced by a contractor's late notice of claim is a question of fact. *Eggers,* 403 F.2d at 233 (stating that Board of Contract Appeals reached an "ultimate finding[ ] of fact" "that the government was prejudiced by [the] plaintiff's long and unreasonable delay in furnishing notice of its claim"); *Big Chief Drilling Co. v. United States,* 15 Cl.Ct. 295, 304 (1988) (holding that summary judgment was inappropriate because "factual uncertainty remain[ed] regarding whether the government was prejudiced by [the] plaintiff's actions" related to notice). *See also Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir. 2000) (concluding that "[p]rejudice is a question of fact" in bid procurement process).

## A.

Koga relies on two Federal Board of Contract Appeals (BCA) cases, *Appeal of Chimera Corp.,* No. 18690, 1976 ASBCA Lexis 223 (1977), and *Precision Tool,* in support of its argument that the State was not prejudiced. In *Chimera,* the BCA heard testimony and made findings in regard to the plaintiff's claim that it was entitled to additional compensation under a contract to build engines. 1976 ASBCA Lexis 223, at *2. The government issued several contract modifications, and over two years after the last modification, and after the completion of the contract, the plaintiff filed a claim for additional compensation, which was denied by the contracting officer.[25] *Id.* at *32.

The BCA stated that "[a]ppeals boards have generally not been inclined to dismiss or deny appeals based solely on the absence of formal notice under the Changes clause where prejudice to the [g]overnment's interest is not shown[.]" *Id.* The government contended that its "interest ha[d] been preju-

diced" due to the lack of available witnesses and records related to the case. *Id.* at 33. The BCA held that the government was not prejudiced by an inability to defend itself, stating that

> [w]hile it may be argued that delay in the assertion of a claim inevitably causes prejudice in some degree, the [BCA] finds that the degree of prejudice presently demonstrated in the record of this appeal is not sufficient to warrant barring the claim for untimeliness. The [g]overnment's most important witnesses were available at the time the claim was asserted, and the premature destruction of its own records is not [the plaintiff's] responsibility.[26] Nonetheless, the foregoing finding does not preclude the [g]overnment from raising the dilatory notice of claim as a defense on the merits of the claim. In this regard, a contractor's failure to file claims timely increases the burden of persuasion which rests upon the claimant, to offset the prejudice caused the [g]overnment.

*Id.* at *33–34 (emphases added, citations omitted).

In *Precision Tool,* the second case cited by Koga, plaintiff entered into a contract with the government to produce mechanical parts. Several months after the government issued a unilateral modification to the specifications for the parts the plaintiff filed a claim for additional compensation, which was denied by the contracting officer for untimeliness. 1971 ASBCA Lexis 135, at *1. The plaintiff appealed to the BCA, which heard testimony and made findings. *Id.* at *2. The BCA found that due to the modification, the plaintiff had to alter its production sequence, and "[g]overnment representatives ... were aware of the reasons for reversing the sequence ... and acquiesced in the revised procedure." *Id.* at *4.

Although the plaintiff did not file a timely written claim, "it kept the [g]overnment's project manager ... fully advised throughout the period of the contract of the problems the modification was causing, including the

---

25. *Chimera* did not state the basis for the contracting officer's decision.

26. Some of the government's witnesses had testified that they could not accurately calculate the plaintiff's claim because government records had been destroyed.

fact that it was increasing [the plaintiff's] costs." *Id.* at *5. The BCA found that the plaintiff, could not predict the effects that the modification would have on its equipment until after getting into production. *Id.* at *6. The government argued it was prejudiced because it lost the "opportunity to withdraw and cancel [the] modification[,] . . . [thereby] giving the [g]overnment an opportunity to consider alternative actions."[27] The BCA held that it could not "find real prejudice to the [g]overnment" because "the [g]overnment has been intimately aware of the underlying facts, including the fact that additional costs were being incurred, from the outset." *Id.* at *9–10 (citations omitted).

## B.

On the other hand, the State relies on *Mingus* for the proposition that it was prejudiced because "Koga's untimely notice foreclosed any opportunity for the State to [consider construction alternatives or monitor actual costs]." In *Mingus*, the plaintiff and the government entered into a contract to build a road. 10 Cl.Ct. at 174. During construction, the plaintiff sent letters to the government stating that it would be filing a claim for additional costs due to the "unreasonable" actions of the contracting officer and " 'other items of work which were either misrepresented by the contract documents or constructed outside the scope of the original design.' " *Id.* at 174–75. Over one year after final payment under the contract had been made, the plaintiff filed its claim, but the contracting officer denied it on the basis that it had not been brought prior to final payment. *Id.* at 175–76.

*Mingus* granted summary judgment in favor of the government, concluding that "[w]hile . . . the contracting officer had actual knowledge that [the plaintiff] . . . had contemplated asserting a right to additional compensation, the 'knowledge' did not extend to specific claims and [did not] override considerations supporting the *final payment*

rule grounded in prejudice to the government from untimely assertion of contractor claims." *Id.* at 178 (emphasis added). *Mingus* looked to affidavits provided by the government showing that it had suffered prejudice as a result of the plaintiff's untimely notice:

> since notice transmitted by way of [the] plaintiff's claim was provided to the government *after the road work had been completed, actual existing conditions cannot be verified; the government was deprived of the opportunity to consider alternate solutions, if necessary; and to maintain records pertaining to the cost of any additional work.* By the time notice was received, the physical aspects of the area in question were completely altered. Under these conditions, the late notice is highly prejudicial to the government's proper analysis and presentation of its case.
>
> . . .
>
> . . . [A]ffidavits submitted by the government show that if timely notice had been provided by [the] plaintiff, the government would have discussed the matter with [the] plaintiff and *would have performed examinations and job site investigations. In addition, the government asserts that investigative results would have been documented.* The validity of the [plaintiff's] claim cannot now be determined with the degree of accuracy or certainty which prompt notice would engender since original site conditions have been altered by construction.

*Id.* (emphases added). The *Mingus* court held that "[v]iewing the record as a whole, it is concluded that the relief [the] plaintiff seeks under the contract fails for lack of timely notice, *in light of prejudice shown by the government.*" *Id.* (emphasis added).

Additionally, the State relies on *Eggers* to support its position that "knowledge of the underlying circumstances does not eradicate

---

27. It is not clear whether the contracting officer "spelled out" this theory in his written decision denying the claim or during his testimony before the BAC. The BAC noted that at the hearing, the contracting officer "conceded merit in the claim and indicated it was, in fact, the advice of his legal advisor . . . to stand on [the plaintiff's] simple failure to file a claim within the 30–day period, rather than bona fide prejudice, which prompted his refusal to consider the claim on its merits." *Id.* at *9.

the existence of prejudice[.]" In *Eggers*, the government, after entering into a construction contract to design a hospital with the plaintiff that contained a fixed deadline, instructed the plaintiff to stop work on the project. 403 F.2d at 227. Approximately two months later the government instructed the plaintiff to resume work, and the plaintiff requested an extension of time in which to complete the work. *Id.* This request was denied by the government, and the plaintiff completed the work within the original deadline. *Id.* at 227–28. Five years later the plaintiff brought a claim for increased compensation as a result of the government's refusal to extend the deadline, but the claim was denied. *Id.* at 228.

The plaintiff appealed to the BCA, which heard testimony and considered findings made by a "trial [c]ommissioner" prior to the BCA's consideration of the case. The contracting officer testified that late notice made it difficult to verify the plaintiff's claims and that had he known plaintiff was going to file a claim, he would have taken alternative action to reduce costs. *Id.* at 230–31. The BCA determined that "the [g]overnment has been deprived of its right and duty to evaluate its position, in the light of a monetary claim, at a time and under conditions when an adjustment ... could have been made." *Id.* The Court of Claims also held that "[w]ith respect to the [BCA's] findings of prejudice to defendant and lack of knowledge of the contracting officer, such determinations are supported by the inherently reasonable testimony of the contracting officer." *Id.*[28]

### C.

Koga argues that *Mingus* and *Eggers* are distinguishable from this case because in those cases the contracting officer (1) did not consider the claim on the merits, and (2) either "did not have any particular knowledge of the facts giving rise to the plaintiff's claims" or did not know that the plaintiff was incurring increased costs. As to Koga's first

point, under the language of the contract in this case, whether the Engineer considered Koga's Claim on the merits and therefore waived time requirements is irrelevant. The contract here expressly allowed for "later notification."

As to Koga's second point, both *Mingus* and *Eggers* looked at the particular facts of each case to determine whether the government was prejudiced by late notice. The issue in *Mingus* was whether the government knew that the plaintiff would be asserting specific claims, and the Court of Claims looked to letters sent by the plaintiff that failed to allege particular facts regarding its claim in concluding that the government was prejudiced. 10 Cl.Ct. at 178. Unlike this case, in *Mingus*, there was no indication that the government was at the construction site to witness any alleged problems the plaintiff was experiencing. *Id.* at 178.

In *Eggers* the issue was whether the government knew that its actions would result in the plaintiff incurring increased costs, and the Court of Claims looked to, *inter alia*, the contracting officer's subjective belief as to whether he believed that the plaintiff would incur increased costs. *Eggers*, 403 F.2d at 234. After the government accelerated the time in which the plaintiff could complete the contract and denied the plaintiff's claim for an extension of time, no further communication on the issue occurred. *Id.* at 228. In this case, on the other hand, once Koga became aware of the inaccuracy in the plans, it notified the State, and changes to the contract were made as a result.

With the exception of *Mingus*, all the cases discussed above relied on witness testimony in determining whether the government suffered prejudice as a result of an untimely claim for increased compensation. In *Mingus*, on the other hand, summary judgment was appropriate because the record showed that the government's knowledge of the plaintiff's claim was so cursory that the "con-

---

28. The Court of Claims found that the contracting officer (1) "did not know, and in fact had sufficient reason to believe and did believe to the contrary, that acceleration of work and increased costs would result from his denial of the requested extension of time," and (2) that the contract-

ing officer "could have deferred the target date for awarding of the construction contract, and taken action necessary to avoid the claimed costs for acceleration of work." *Eggers*, 403 F.2d at 234.

tracting officer [did not] know[ ], or [was not] properly chargeable with knowledge, that at the time of final payment the [plaintiff was] asserting a right to additional compensation." [29] 10 Cl.Ct. at 177 (citation omitted).

## X.

 It is established that "in reviewing summary judgment decisions[,] an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki*, 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983) (citing *Fernandes v. Tenbruggencate*, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982)). In that connection,

> summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.* A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. *In other words, we must view all of the evidence and the inferences drawn therefrom, in the light most favorable to the party opposing the motion.*

*Omerod v. Heirs of Kaheananui*, 116 Hawai'i 239, 254–55, 172 P.3d 983, 998–99 (2007) (citations omitted) (emphases added). Whether or not the State suffered prejudice is a material fact, because "establishing or refuting" it would determine whether or not Koga's claim was barred by the "later notification" provision of the contract. *See Omerod*, 116 Hawai'i at 255, 172 P.3d at 998 (stating that "[a] fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties"). Under

the "later notification" provision, proof of prejudice is an "essential element of a . . . defense asserted by [the State]." *Id.*

### A.

In that connection, the State provided a declaration by Panem (Panem's first declaration), in which he stated that "because of the lack of notice, the State was not aware that it should monitor the costs claimed by Koga as the work progressed." Additionally, in its memorandum in opposition to Koga's motion for partial summary judgment (memorandum in opposition), the State proffered a second declaration, wherein Panem stated that due to the lack of notice, the State had not explored construction alternatives or monitored Koga's costs

> *[b]ecause the State did not receive timely notice that Koga would be making a claim* based upon the discovery of the waterline, the directed suspension of work, and the denial of double shift work, *the State did not explore construction alternatives* such as suspending the entire project until the waterline was relocated or terminating the project at one of several points such as shortly after the waterline was discovered in September of 1997, when Koga submitted the revised construction work schedule in November of 1997, or when [C]hange [O]rder [N]o. 5 was negotiated, *or monitor the costs claimed by Koga as the work progressed.* [30]

(Emphases added.)

On the other hand, in Koga's opposition to the State's motion for summary judgment, Koga argued that Change Order No. 5 did not "operate[ ] as a full and final release of Koga's claims for additional compensation[.]" According to Koga, "the State was clearly aware of the changes resulting from the unanticipated discovery of the conflict involving the [waterline,]" because "Koga provided immediate notice to the State regarding the problems stemming from the location of [the

---

**29.** As discussed above, in notifying the contracting officer that it would be filing a claim, the plaintiff "did not specify any particular instances of misconduct or connect any specific substantive claims to the project superintendent's conduct[.]" *Mingus*, 10 Cl.Ct. at 175.

**30.** Panem's declaration regarding prejudice in the State's memorandum in opposition was nearly identical to his declaration in the State's motion for summary judgment, except that the latter did not reference "the directed suspensions of work[ ] and the denial of double shift work[.]"

waterline]." Koga cited to the Sakaitini affidavit, which stated that (1) "[a]side from a few exceptions, state officials and/or its construction managers were present at the Project site at all times during Koga's work on the Project[,]" (2) "[f]ollowing a meeting with the State, it was jointly decided that Koga would abandon its Approved Schedule and start with work on ... Phase II[,]" (3) Koga eventually began work on Phase I, but "contrary to the parties' discussions, the State issued a stop order on [Phase I work,] ... [and] Koga was then forced to re-shuffle its work on the water system in Phase III[,]" and (4) "Koga and the State [ ] had daily discussions in regards to Koga's progress and work schedule on the Project." Koga argued that the State was not prejudiced because it was "obviously aware of the underlying facts, including the fact that additional costs were being incurred[.]"

### B.

In sum, at the summary judgment stage, the State presented evidence to the court that it was prejudiced by lack of notice prior to Koga's Claim, while Koga presented evidence that the State was aware of the facts giving rise to Koga's Claim, and thus that the State was not prejudiced. Therefore, ordering summary judgment on this issue of material fact was wrong. *See Ameron, Inc. v. Tradewinds Elec. Service & Contracting Inc.*, 80 Hawai'i 218, 224, 908 P.2d 1204, 1210 (1995) (vacating grant of summary judgment on the basis that a genuine issue of material

fact remained). Because Koga was not entitled to judgment as a matter of law in regard to whether the State was prejudiced, the court's grant of Koga's motion for partial summary judgment must be vacated, and the case remanded for trial on the prejudice issue.[31]

### XI.

■ It should also be noted that despite the fact that the court granted Koga's motion for summary judgment in part on the basis that the State did not suffer prejudice, at the subsequent trial, the court found in finding no. 298 that Koga "failed to adequately inform the State that it was experiencing [indirect costs associated with Change Order No. 5]. As a result, the State was unable to keep strict account of the actual costs incurred by Koga." Additionally, the court found in finding no. 297 that "Koga failed to impress upon that State ... that [it] would be making a claim for additional money as a result of the denial of the night work request." [32]

These findings appear to contradict the court's determination at the summary judgment stage that the State "was not prejudiced." The parties do not cite to any Hawai'i case law addressing the issue of whether, in its review of a summary judgment ruling, an appellate court can consider a trial court's findings made at trial subsequent to the ruling on the motion for summary judgment. However, it has been stated that at the summary judgment stage, the

---

31. In Koga's Response to the State's Application, Koga states that it "strongly prefers to proceed with the remand to the [court] as set forth in the decision of the [ICA], and should [this court] deny the State's [Application], Koga wishes to withdraw its [Application] and to proceed to close this matter consistent with the [ICA's SDO]." Inasmuch as the ICA incorrectly affirmed the grant of partial summary judgment to Koga, the case cannot be remanded as determined by the ICA.

32. In its Opening Brief, the State relied on findings nos. 297 and 298 in support of its argument that it was prejudiced. The State did not reference the court's findings in its Reply Brief or Application. In its Answering Brief, Koga argued that the State's reliance on the court's findings was "misplaced, as this evidence was not before the [court] at the time the [court] ruled on

Koga's [motion for summary judgment], and therefore cannot be considered on appeal."

Additionally, Koga claimed that "the State's argument is misleading as [findings nos. 297–298] were related to the issue of damages and contrary to the [court's order] on Koga's motion in limine on notice." In that order, issued on March 15, 2006, the court ruled that Koga's Motion in Limine Precluding the State From Introducing Evidence and/or Testimony Regarding the Defense of Lack of Written Notice Relating to Koga's Claims was "granted to the extent that the [Summary Judgment Order] remains in effect." The court also ruled that "[t]he State may introduce evidence on the lack of written notice on the issue of accord and satisfaction regarding Change Order No. 5 and the reasonableness of the State's actions with respect to Koga's double shift claim."

appellate court "can consider only those papers that were before the trial court. The parties cannot add exhibits, depositions, or affidavits to support their position." 10A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2716 at 282 (3d ed.1998).

It appears that a majority of jurisdictions has interpreted this statement to mean that "review [of a ruling on a motion for summary judgment] is confined to an examination of the materials before the court at the time the rulings were made. Neither the evidence offered subsequently at the trial nor the verdict is relevant." *Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir.1985). *See also Lippi v. City Bank*, 955 F.2d 599, 604 (9th Cir.1992) (stating that in reviewing motion for summary judgment, appellate court "do[es] not rely on evidence introduced at trial or on the jury's verdict"); *Cullen Enters. v. Mass. Property Ins. Underwriting Ass'n*, 399 Mass. 886, 507 N.E.2d 717, 719 n. 9 (1987) (noting that *"[t]he [defendant] in its brief argues that the trial judge's findings of fact support its assertion that summary judgment was improperly allowed"* but concluding that "[r]eliance on facts not before the motion judge is improper" and that review of a motion for summary judgment is *"confined to an examination of the materials before the court at the time the rulings were made"* (emphases added)).[33]

Following the foregoing approach, this court cannot consider trial findings no. 298 and no. 297 made by the court in comparison with the Summary Judgment Order. Thus "we are confined to an examination of the materials before the court at the time the [summary judgment] rulings were made." *Cullen Enters.*, 507 N.E.2d at 719 n. 9.

**33.** The Third Circuit has reached a seemingly opposite conclusion. See *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 285, (3rd Cir.1991) (stating that in its review of motion for summary judgment, it would "consider any additional evidence in the record before us, even though that evidence may have been submitted to the district court after it had ruled on [the plaintiff's] motion, in order to avoid any prejudice to [the defendant] and as part of our plenary review"). However, this conclusion was reached in the context of the district court's conversion of a Federal Rules of Civil Procedure Rule 12(b)(6) motion into a motion for summary judgment, a factual scenario that is not present in this case.

## PART III

### I.

### A.

In regard to the retainage dispute, the court made the following findings:

303. *On October 4, 1999, Koga gave the State notice that Koga was substantially complete with the Project* as of Friday, October 1, 1999.

304. The State, [Wesley] Segawa[34] and Koga conducted a final inspection in November of 1999 [ (first inspection) ].

305. *In 1999, [the] State proposed giving Koga a rebate*[35] *due to punchlist*[36] *work] on the sidewalks, curbs and gutter.*

(Emphases added.) According to Koga, it "did not accept the rebate, choosing instead to perform corrective work on the punchlist items."

In the meantime, on December 26, 2001, Koga filed its Complaint as noted previously. In its Complaint, Koga stated that "[the court] has jurisdiction over the State in this action pursuant to Hawai'i Revised Statutes [HRS] § 661–1(1) and [HRS] § *103D–711*." (Emphasis added.) According to Koga, the Complaint did not raise "the issue of the State's failure to pay Koga's retention" because "[a]t the time Koga filed its Complaint ..., the issue ... had not yet arisen as Koga's corrective work on the Project was still ongoing."

At trial, the court made the following findings regarding Koga's work on the punchlist:

**34.** Segawa was hired by the State to help monitor the Project.

**35.** Although not defined by the parties, a "rebate" in this context appears to be a reduction in the amount paid by the State to Koga as a result of unfinished work.

**36.** The "punchlist" "is [a] list of non-conforming work[.]" The term "non-conforming work" was not defined by the parties, but was apparently work on the Project that the State deemed unfinished or necessary of correction.

306. Koga thereafter performed work on the punchlist and advised Segawa of this work in a memo dated December 2, 2004.

307. *A second inspection was conducted by [Gene Quiamas (Quiamas), a Highway Construction Inspector for the State,] on December 9, 2004.*

In a December 9, 2004 facsimile from Quiamas to Panem regarding the second inspection (Quiamas's facsimile), Quiamas provided a list of work that Koga was required to complete. Quiamas related that a majority of the items on the list was complete, but indicated that there were also items on the list not completed. Quiamas stated that "Koga has previously indicated that they [sic] will work directly with [the] DOT[ ] to resolve [the uncompleted items]."

In regard to the second inspection, the court found that:

308. *Panem concluded that the only remaining punchlist items related to the following:* (a) a construction joint at curb and gutter not uniform; (b) concrete droppings, blotches, fins, burrs, tripping hazards; (c) curb and gutters: joints do not match, at GDIs, curbs do not have batter; concrete spalling on curb and gutter; uneven elevations; (d) waves on curbing.

309. *Panem calculated a rebate for the punchlist items of $62,762.11.*

310. Quiamas stated that there is a certain amount of deviation that would be acceptable but that the contract documents only provide the State with the discretion. Quiamas knows of other projects where the [State Department of Transportation] allowed some deviation.

311. *In the State's Progress Payment No. 36 dated December 14, 2004, Mr. Panem admits that the work completed is "100%."*

312. Koga should be paid its retainage because Koga completed the requirements of the [c]ontract.

(Emphases added.) Progress Payment No. 36 is a form. According to the completed blanks on the form, the "Work Completed" was "100.0%," the "Payment now Due" was "$82,487.89," and the "Retainage" was "$62,-

762.11." In other words, it appears that following the first inspection, the State had calculated Koga's retainage to be $145,250. In the second inspection, the State determined that Koga had completed some of the work identified as incomplete in the first inspection, and it appears the State recalculated Koga's retainage as $62,762.11 to reflect incomplete work. According to Quiamas's facsimile, Koga had not completed five out of fifty-eight items on the punchlist. Progress Payment No. 36 was signed by Panem on December 14, 2004, but was not signed by Koga. This was after Koga had filed its Complaint on December 26, 2001.

### 1.

On January 13, 2006, the State filed a "motion in limine to exclude [the] introduction of evidence on[, *inter alia*,] . . . [w]hether the retainage held by the State is appropriate." According to the State, the issue of retainage was "not raised in the Complaint. Accordingly, evidence on these issues should be precluded at trial." Citing a contract provision allowing the State to "retain 5% of the value of the work done until final payment on the Contract is made[,]" the State argued that Koga "ha[d] not alleged in its Complaint that it has satisfactorily completed all the work required . . . or that final payment on the Contract has been made." The State then asserted that Koga would "add retainage . . . to the Complaint."

> [Koga] has asked several deponents about the retainage and the status of the [punchlist] and whether the specifications may be waived. *The State anticipates that [Koga] will add the retainage and punchlist issue to the Complaint.* These issues were not raised in the Complaint and evidence on these issues should be excluded.

(Emphasis added.)

### 2.

On January 20, 2006, Koga filed a memorandum in opposition to the State's motion in limine (Koga's opposition to the motion in limine) arguing that "evidence of the State's withholding of retainage goes directly towards Koga's claim for *breach of contract*." [37]

---

37. According to Koga, "[t]he State breached the following contractual provision (payment provi-

(Emphasis added.) According to Koga, (1) "in order to obtain a final and just resolution of this case, the issue of retainage must be addressed by the Court ... [,]" (2) "[t]he State was aware of this fact as Koga and the State were previously negotiating a settlement and release of the retainage[, h]owever, there were differing opinions between the parties as to what would be released and what work remained under the [c]ontract[,]" and (3) "as there were extensive negotiations ... regarding retainage, the State simply cannot argue that it didn't know retainage would be an issue in this case."

### 3.

On January 25, 2006, the court orally denied the State's motion in limine to exclude the issue of retainage.[38] On May 15, 2006, the court issued its Findings of Fact, Conclusions of Law, and Order. In the following relevant conclusions the court decided Koga was entitled to the retainage because it had completed the contract:

39. *Koga performed all of the work that it was hired to perform and was contractually obligated to perform in regard[ ] to the project.*

40. *The State admitted that, except for a few outstanding punchlist items, Koga performed all of [its] duties under the contract* and Koga has, therefore, proved by a preponderance of the evidence that it fully performed all of [its] contractual obligations in regard[ ] to the Project.

. . . .

169. *The [c]ourt hereby rejects the State's argument that Koga should not be paid its retention.*

sion)":

> For and in consideration of the covenants, undertakings and agreements of the CONTRACTOR herein set forth and upon full *and faithful performance thereof by the CONTRACTOR,* the STATE hereby agrees to pay the CONTRACTOR the sum of FIVE MILLION EIGHT HUNDRED NINETY ONE AND 87/100 DOLLARS ($5,809,991.87) in lawful money, but not more than such part of the same as is actually earned according to the STATE's determination of the actual quantities of work performed and materials furnished by the CONTRACTOR at the unit or lump sum prices

170. The State's refusal to pay Koga the unpaid retainage *constitutes a material breach of its contract with Koga* in regard[ ] to the Project.

171. *The [c]ourt hereby awards Koga its full retention of $145,250.*

(Emphases added.)

### B.

The ICA held that "[conclusions no.] 169 and no. 171 are wrong" because such a claim had not been made in Koga's complaint:

> The [court] erred by finding that the State breached the [c]ontract by failing to pay Koga its retainage and by including the State's retainage in its damages award because *in the Complaint, Koga failed to assert a claim for retainage and cite to the [c]ontract provision the State allegedly breached by failing to pay the retainage. Otani v. State Farm Fire & Cas. Co.,* 927 F.Supp. 1330, 1335–36 (D.Haw.1996); *Au v. Au,* 63 Haw. 210, 221, 626 P.2d 173, 181 (1981); *Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship,* 115 Hawai'i 201, 216 n. 17, 166 P.3d 961, 976 n. 17 (2007).

*Koga,* 2009 WL 641461, at *6 (emphasis added).

### II.

In its Application, Koga presents the following questions:

1. *Is it proper for an appellate court to deny a plaintiff recovery on a breach of contract claim based on the plaintiff's failure to cite to the contractual provision allegedly breached in his or her complaint, when it is undisputed that: (i) the defen-*

> set forth in the attached proposal schedule. *Such payment, including extras, shall be made, subject to such additions or deductions hereto or hereafter made in the manner and at the time prescribed in the specifications and this contract.*

(Emphases added.)

**38.** The court stated "I'm going to allow the evidence in so the motion is denied except for weather." In its motion in limine, the State had also sought to exclude "[e]vidence regarding the State's suspension of work due to unsuitable weather[.]"

dant had notice of the claim; (ii) the plaintiff is able to cite to the contractual provision breached by the defendant; and (iii) the defendant breached the contractual provision?

2. Does a trial court's: (i) authorization of the introduction of evidence on an issue which a defendant asserts was not raised in the complaint, and (ii) subsequent entry of findings on the same issue, *constitute a constructive amendment of a plaintiff's pleadings as permitted by [Hawai'i Rules of Civil Procedure (HRCP)] Rule 15(b)* [ ]? [39]

3. Can a conclusion of law that a party is contractually entitled to payment be overturned when the conclusion is supported by a trial court's findings of fact and the application of the correct rule of law?

(Emphases added.) Koga maintains that "[t]he retainage [it] seeks is not an additional award of damages, but simply the remainder of the payment due … [because] 'Koga completed the requirements of the contract.'"

### III.

However, in its Response, the State argues for the first time [40] that Koga "never submitted" its retainage claim as required by HRS § 103D–703 (Supp.1999), and thus, this court lacks jurisdiction. HRS § 103D–703, entitled "[a]uthority to resolve contract and breach of contract controversies[,]" provides in relevant part that

(a) *This section applies to controversies between a government body and a contractor which arise under … a contract between them, including, without limitation, controversies based upon breach of contract … or other cause for contract modification or rescission.*

(b) *The chief procurement officer, the head of the purchasing agency, or a designee of either office is authorized, prior to commencement of an action in a court concerning the controversy, to settle and resolve a controversy* described by subsection (a). This authority shall be exercised in accordance with rules adopted by the policy office.

(c) If such a controversy is not resolved by mutual agreement, *the chief procurement officer[ or] the head of a purchasing agency … shall promptly issue a decision in writing.* The decision shall:

(1) State the reasons for the action taken; and

(2) *Inform the contractor of its right to initiate a judicial action as provided in this part.*

. . . .

(e) The decision under subsection (c) shall be final … *unless the contractor commences a judicial action in accordance with section 103D–711.*

(f) *If the chief procurement officer, the head of the purchasing agency, or the designee of either office does not issue the written decision* required under subsection (c) within ninety days *after written requests for a final decision,* or within such longer period as may be agreed upon by the parties, *then the contractor may pro-*

---

**39.** HRCP Rule 15, entitled "Amended and Supplemental Pleadings," states in relevant part in subsection (b) that

*[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.* Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by pleadings, the court may allow the pleadings to be amended and shall do so freely when* the pres-

entation of the merits of the action will be subserved thereby and *the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.* The court may grant a continuance to enable the objecting party to meet such evidence.

(Emphases added.)

**40.** In its Opening Brief, the State did state that *"Koga never claimed the retainage as part of its damages during the Administrative Proceedings,* when it filed its complaint, when it responded to the State's discovery requests, or in its expert report." (Emphasis added.) However, the State did not argue that this divested the court of jurisdiction to decide the retainage issue.

ceed as *if an adverse decision had been received.*

(Emphases added.) HRS § 103D–711 (Supp. 1999) allows a party aggrieved by an adverse decision under section 103D–703, to commence judicial action. HRS § 103D–711 states in relevant part that "[a] person aggrieved by a decision issued pursuant to section 103D–703 . . . may initiate an action under section 661–1. . . . To the extent the remedies provided in this part . . . differ from the remedies available against the State under chapter 661, the remedies shall be as provided in this part." HRS § 661–1 (1993) establishes jurisdiction in the circuit courts over contract disputes against the State and provides that "[t]he several circuit courts of the State . . . shall . . . have original jurisdiction to hear and determine . . . [a]ll claims against the State founded . . . upon any contract . . . with the State[.]" According to the State, Koga did not exhaust its administrative remedies under HRS § 103D–703, and thus "[this c]ourt does not have jurisdiction over the retainage claim[.]"

IV.

◼◼◼◼ Although the State failed to raise its jurisdiction argument before the court or in its appeal to the ICA, "[i]t is well-established . . . that lack of subject matter jurisdiction can never be waived by any party at any time." *Chun v. Employees' Ret. Sys.,* 73 Haw. 9, 13, 828 P.2d 260, 263 (1992) (citing *In re Application of Rice,* 68 Haw. 334, 713 P.2d 426 (1986)). Accordingly, "[w]hen reviewing a case where the circuit court lacked subject matter jurisdiction, the appellate court retains jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction." *Amantiad v. Odum,* 90 Hawai'i 152, 159, 977 P.2d 160, 167 (1999).

A.

◼◼◼ In this case, the parties do not dispute that following the first inspection, the

State properly notified Koga of "non-conforming work." Pursuant to Section 105.17, Koga attempted to "correct and complete the non-conforming work." On December 2, 2004, Koga sent a letter to Quiamas (December 2, 2004 letter), which stated as follows: "Please be informed that items 30, 41, 50, 53, 54, 56, & 57 on the final punchlist has [sic] been completed as of this date. Please acknowledge completion of these items and contact me should you have any questions."

As noted above, on December 9, 2004, the State conducted the second inspection. Quiamas confirmed that Koga had completed the work items listed by Koga in its December 2, 2004 letter, but he also determined that other work items on the punchlist remained incomplete.[41] Indicating these items on the punchlist using a checkmark, Quiamas sent a facsimile of the punchlist with his notations to Panem. It is not clear whether Koga received a copy of the punchlist indicating the incomplete work identified by Quiamas.[42] However, Panem stated in his deposition that Progress Payment No. 36, which released a portion of the retainage held by the State, "probably was transmitted to Koga's office," and that "all [the State was] waiting for [was] for Koga to return it with [its] signature." Koga does not claim that it did not receive Progress Payment No. 36, or that it was not properly notified by the State that there were work items on the punchlist that the State continued to deem non-conforming.

B.

In this case, HRS § 103D–703 sets forth a procedure for resolving contract controversies under which the State "is authorized, prior to commencement of an action in a court concerning the controversy, to settle and resolve . . . in accordance with rules adopted by the policy office." HRS § 103D–703(b). At the point that the State notified Koga of non-conforming work discovered during the second inspection, Koga was required under section 105.17 of the contract to

41. In particular, Quiamas indicated that items 15, 16, 52, 55, and 58 were not complete.

42. At the bottom of the cover sheet of Quiamas's facsimile, the following is written: "c: Kyle Sakaitini, Koga 325–8228." Furthermore, the cov-

er sheet stated that "[b]y way of this facsimile, I'll inform Koga to recheck the area and make it presentable." This appears to indicate that Kyle Sakaitini, the head of Koga's Big Island operations, was copied on Quiamas's facsimile.

"correct and complete the non-conforming work." If Koga disagreed with the State's position that non-conforming work remained, and therefore Koga felt that it was entitled to the retainage withheld by the State in Progress Payment No. 36, such a disagreement would constitute a "controversy" within the meaning of HRS § 103D–703 that the Engineer was "authorized, prior to commencement of an action in a court concerning the controversy, to settle and resolve[.]" HRS § 103D–703(b).

Thus Koga's claim that the State has "breached the contract" by failing to pay retainage is a "controvers[y]" within the meaning of HRS § 103D–703, and accordingly, the procedure set forth in that statute applies to Koga's retainage claim. HRS § 103D–703(a). Neither party has identified relevant "rules adopted by the policy office" that would apply in this case, but, as the State points out, Section 105.17(B) of the contract sets forth the procedure regarding completion of the contract and "non-conforming work" as follows:

> (B) Final Acceptance. Upon notification from the Contractor of completion of the project, the Engineer will make an inspection. If the Engineer finds the work completed according to the contract, the inspection is final. The Department will notify the contractor in writing of its acceptance as of the date of the final inspection.
>
> The Engineer will notify the Contractor in writing if the inspection discloses non-conforming work. *The Contractor shall correct and complete the non-conforming work. Upon completion the Contractor shall notify the Engineer. The Engineer shall make another inspection. If the Engineer finds the work completed according to the contract, the inspection is final.*

(Emphasis added.)

## V.

 This court has stated that "[w]hen construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Crosby v. State Dep't of Budget & Fin.*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994) (internal quotation marks and citation omitted). Courts "must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Franks v. City & County of Honolulu*, 74 Haw. 328, 335, 843 P.2d 668, 671 (1993) (citation omitted). Furthermore, "[t]he courts may resort to extrinsic aids in determining the legislative intent ... [and] [o]ne avenue is the use of legislative history as an interpretive tool." *Carl Corp. v. State Dep't of Educ.*, 93 Hawai'i 155, 172, 997 P.2d 567, 584 (2000) (citation omitted).

### A.

 As noted *supra*, the procedure for resolving contract "controversies between a governmental body and a contractor" is set forth in HRS § 103D–703 as follows: (1) "[t]he chief procurement officer, the head of a purchasing agency, or a designee of either office is authorized, [43] prior to commencement of an action in a court concerning the controversy, to settle and resolve [the] controversy[,]" HRS § 103D–703(b); (2) "[i]f ... a [breach of contract] controversy is not resolved by mutual agreement, the [State] shall promptly issue a decision in writing[,]" HRS § 103D–703(c); (3) this decision is "final and conclusive unless ... the contractor commences a judicial action in accordance with section 103D–711[,]" HRS § 103D–703(e); (4) "[i]f the [State] does not issue the written decision under subsection (c) ... *after written request for a final decision,* ... *then the contractor may proceed as if an adverse decision had been received[,]*" HRS § 103D–703(f); (5) "[a] person [44] aggrieved by a

---

**43.** The State does not specifically identify who in this case was authorized to resolve the retainage controversy. Nevertheless, because Koga filed its Claim with the Engineer, it is presumed that the Engineer would also be the "designee of either office" who would resolve the controversy.

**44.** In 1999, HRS § 103D–711 was amended, *inter alia,* to read as follows: "(a) Only parties to the contract aggrieved by a decision issued pursuant to section 103D–703 by a state chief procurement officer or a designee may initiate an

decision issued pursuant to section 103D–703 ... *may initiate an action under section 661–1*[,]" HRS § 103D–711 (emphases added).

HRS § 103D–704 (Supp.1997), entitled "[e]xclusivity of remedies," states that "[t]he procedures and remedies provided for in this part, and the rules adopted by the policy office, *shall be the exclusive means available for persons aggrieved* ... in connection with a contract controversy, to resolve their claims or differences." (Emphasis added.) Thus, construing HRS § 103D–704 in pari materia with HRS § 103D–703, it would appear on the face of the statutes that the procedure established in HRS § 103D–703 was the "exclusive means available," HRS § 103D–704, for Koga to resolve the retainage controversy prior to filing suit on the retainage matter.

### B.

The legislative history confirms this reading of the statute. In enacting Act 8, which established HRS chapter 103D, the legislature's intent was to create "a single source of public procurement policy to be applied equally and uniformly to the State and counties." Act 8, § 1, 1993 Special Session Laws of Hawaiʻi, at 37. One of the purposes of Act 8 was "to promote economy, efficiency, and effectiveness in the ... construction of public works[.]" *Id.* at 38. Writing in regard to S.B. S3–93, the bill which became Act 8, the Senate Committee stated that it was adopting the recommendation of "public procurement experts" that the Procurement Code "be updated to centralize the process and provide for increased accountability and efficiency." S. Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal, at 39. According to the

Senate Committee, "[f]or written contract disputes, both the governmental body and the contracting party may proceed in circuit court *after the Chief Procurement Officer renders a decision.*" *Id.* at 40 (emphasis added). The House Committee stated that S3–93 "[p]rescribes remedies and provides mechanisms for the resolution of disputes relating to ... contract performance[.]" H. Stand. Comm. Rep. No. S11–93, in 1993 House Journal, at 64. The legislative history supports the view that the legislature intended to establish a uniform and exclusive procedure for resolving contract disputes before suit is filed.[45]

### VI.

The State has not indicated exactly the subsection of HRS § 103D–703 Koga violated. The State claims that "the retainage claim was never submitted" to the State for administrative review. Koga's Application makes reference to "negotiations ... regarding the issue of Koga's unpaid retainage," citing as support the court's finding no. 305 that "[i]n 1999, [the] State proposed giving Koga a rebate due to punchlist [work] on the sidewalks, curbs and gutter." The State has not disputed that such "negotiations" occurred with Koga regarding the retainage, and thus it would appear that the parties were attempting to "settle" a "controversy" as required under HRS § 103D–703(a).

Pursuant to HRS § 103D–703(f), "[i]f such a controversy is not resolved by mutual agreement," as it obviously has not been in this case, Koga was required to make a "written request for a final decision" on the issue of retainage. However, Koga provided no indication in the record that it ever made

---

action under section 661–1." 1999 Haw. Sess. L. Act 162, § 9 at 537.

**45.** The ICA recently decided *Communications–Pacific Inc. v. City & County of Honolulu,* 121 Hawaiʻi 527, 221 P.3d 505 (App.2009), in which Communications–Pacific (Comm–Pac) argued that the circuit erred in ruling that it was "barred from seeking judicial review of its claims based on the language of the statute governing the procurement process and interpretive case authority." *Id.* at 508. The ICA held that HRS chapter 103D, the Hawaiʻi Public Procurement Code (Procurement Code), barred Comm–Pac

"from bringing a lawsuit against the City seeking damages sounding in tort for injury suffered as a result of the City's alleged violations of the Procurement Code." *Id.* In arriving at this conclusion, the ICA held that the "plain language of HRS § 103D–704 precludes resort to other remedies for injuries that arise in connection with those specified areas" of "solicitation or award of a contract, a suspension or debarment proceeding, or a contract controversy[,] [ ] to resolve their claims or differences." *Id.* at 509 (internal quotation marks omitted).

such a request pursuant to 103D–703(f). It does not seem that a "decision in writing" was ever issued by the State in regard to retainage under 103D–703(c). The statute does provide that "[i]f the [State] does not issue the written decision . . . within ninety days after written request for a final decision, . . . then the contractor may proceed [with suit] as if an adverse decision had been received." HRS § 103D–703(f). But as indicated, there does not appear to be any evidence that a request to the State for a final decision as to retainage was made by Koga.

## VII.

Pursuant to HRS § 103D–703(f), if Koga did not make "written requests for a final decision," it could not "proceed as if an adverse decision had been received[,]" and therefore, Koga could not seek relief in the court on its claim for retainage. *See* HRS § 103D–704. Because this argument was raised for the first time in the State's Response, an order for a supplemental memo by Koga was filed.

## VIII.

### A.

In its supplemental memorandum, Koga argues first that "[t]he relevant facts do not fall within the scope of HRS §§ 103D–703 and 103D–704" because "there are no claims . . . in connection with a 'contract controversy[.]' " However, as Koga notes, "[a] 'controversy' is defined as: '[a] litigated question; adversary proceeding in a court of law; a civil action or suit, either at law or in equity; a justiciable dispute." (Quoting *Black's Law Dictionary* 298 (5th ed.1968).). Koga's claim for retainage was obviously a "litigated question" or "justiciable dispute," because Koga argued before the court that it was *contractually* entitled to the retainage, while the State argued that it had "the contractual right to withhold the retainage[.]" Thus, contrary to Koga's argument, its claim for retainage was a "contract controversy" that fell within the scope of HRS § 103D–703.

### B.

Second, Koga argues that based upon the findings and conclusions of law (conclusions), "it is obvious that any pursuit as to administrative remedies would have been futile as the State was clearly not willing to pay . . . until and unless the Koga claim was sustained on appeal." Koga maintains that "the outcome of any attempt to 'settle and resolve' the issue . . ." was "predetermined," because "[t]he State has twice conducted [ ] inspections [of Koga's work], and subsequent to the second inspection in 2004, proposed reducing Koga's retainage by more that $60,000. Koga felt this was unacceptable given [Panem's] admission that Koga's work was '100%' completed."

### C.

As noted before, section 105.17(B) of the contract sets forth the procedure regarding completion of the contract and "non-conforming work." To reiterate, pursuant to section 105.17(B), *see supra,* Koga notified the State of the "substantial completion" of the Project by a letter dated October 4,1999, in which Koga stated that "[t]his letter is written to notify you that [Koga] is substantially complete with the [Project] as of Friday October 1, 1999." As a result of this notification, the State conducted an inspection on November 12, 1999, and notified Koga of the results by facsimile on November 15, 1999. The facsimile contained a cover letter stating that "[a]ttached is a copy of the [p]unchlist from the walkthrough held on November 12, 1999 for your corrective action as required. . . . Please note that the punchlist does not include change order work currently being routed for approval . . . and change order work noted during the walkthrough." The facsimile included the punchlist, which listed 52 items of work for which "corrective action" was required. Based on the non-conforming work identified in the punchlist, the State set a retainage amount of $145,250.00.

It appears that the State also "proposed giving Koga a rebate due to punchlist [items] on the sidewalks[sidewalks], curbs and gutter." But "Koga did not accept the rebate, choosing instead to perform corrective work on the punchlist items." Thus, there is no

evidence in the record that Koga disagreed with the State's determination that non-conforming work existed on the Project.

The next interaction between the parties was a facsimile from Koga to the State on December 2, 2004, in which Koga "informed" the State "that items 30, 41, 50, 53, 54, 56, & 57 on the final punchlist [46] has [sic] been completed as of this date. Please acknowledge completion of these items and contact me should you have any questions." After the State received Koga's December 2, 2004 facsimile, "[a] second inspection was conducted by Quiamas on behalf of the [State] on December 9, 2004."

Based on the second inspection, Quiamas concluded that Koga had completed all but five items on the punchlist. As indicated before, in a facsimile entitled "Punchlist Status Update" dated December 9, 2004, Quiamas informed Panem that "Koga has previously indicated that they will work directly with [the State] to resolve [the] items" that Quiamas had determined were not complete.

As noted before, on December 14, 2004, the State prepared Progress Payment No. 36 that appeared to release to Koga some of the retainage withheld by the State. According to the completed blanks, the "Work Completed" was "100.0%" and, as noted before, the "Payment now Due" was "$82,487.89," and the "Retainage" was "$62,762.11." Koga does not dispute that it received Progress Payment No. 36, but felt this was unacceptable given the Engineer's admission that Koga's work was "100%" completed.

#### D.

Koga relies on *Poe v. Hawaii Labor Relations Bd.*, 97 Hawai'i 528, 537, 40 P.3d 930, 939 (2002). *Poe* involved a contract that set forth a four-step process for the filing of grievances by public employees against their employer, the State of Hawai'i. *Id.* at 532, 40 P.3d at 934. In *Poe*, an employee who had filed a grievance completed the first three contract steps, but did not complete the fourth, because it involved an arbitration procedure that only his union was authorized to initiate, and the union had refused the employee's request to initiate arbitration. *Id.* at 537, 40 P.3d at 939. This court held that "[b]ecause [the employee] could move no further in the grievance procedure, he had exhausted his administrative remedies. Requiring him to repeatedly request the [union] to pursue his grievance would be futile." *Id.* at 538, 40 P.3d at 940.

In *Poe*, the employee was able to establish futility because his union had already refused his request to enter into arbitration; any further requests would undoubtedly have been similarly denied. In this case, however, up to and including the time that Progress Payment No. 36 was issued, the State had simply been operating within the terms of section 105.17(B) by "notify[ing] the Contractor in writing if the inspection discloses nonconforming work." After the first inspection, the State withheld $145,250.00 in retainage, and after the second inspection, the State indicated that it was releasing 57% of the retainage amount to Koga, while continuing to withhold $62,762.11 in retainage. Progress Payment No. 36 on its face may appear contradictory, in that it stated that the "Work Completed" was "100%," yet it also continued to withhold retainage.[47] Nevertheless, unlike in *Poe*, if progress could not be made in resolving the dispute, HRS § 103D–703 provided that Koga request in writing that the State issue a final decision in order for it to file suit. The parties were already engaged in litigation, and the State's decision to defend itself against Koga on the retainage issue after it became clear that Koga would raise it before the court does not establish the "futility" of the administrative remedy in HRS § 103D–703.

#### IX.

#### A.

Third, Koga argues that it "twice requested the State to make a decision on its retain-

---

**46.** Although the punchlist attached to the November 15, 1999 facsimile from the State to Koga listed only 52 items, as noted *supra*, the cover sheet to the facsimile stated that the punchlist did not include certain "change order" work. Thus, it appears that other work items were added to the punchlist at a later date.

**47.** The State maintains that under the contract Progress Payments are only "estimates."

age claim when it sought the State's final acceptance of Koga's work and final payment under section 105.17 and 109.10 of the [c]ontract." According to Koga, "[t]he State never adequately responded to Koga's requests, much less provide a response within the ninety days set forth in HRS § 103D–703."

Koga asserts that (1) "[a]t this point, the State had the option of ( [a] ) terminating the [c]ontract pursuant to [s]ection 108.09[ [48]] or ( [b] ) attempting to settle the claim with Koga pursuant to HRS § 103D–703[,]" (2) "[i]nstead, the State simply allowed Koga's claim to remain dormant, and Koga was required to wait until the State took any step which would have permitted its claim for retainage, either under Section [ ] 108.09 or HRS § 103D–703[,]" and (3) "Koga therefore would have been permitted to proceed as though an adverse decision had been rendered based upon the State's failure to take either action." But Koga provides no authority for this statement, and indeed, it appears incorrect in light of the statutory procedure set forth above.

As to the State's purported option to terminate the contract, such option existed within the terms of the contract itself, and operates independently of HRS § 103D–703. Thus, whether or not the State terminated the contract pursuant to section 108.09 appears irrelevant to whether the procedure set forth in HRS § 103D–703 was followed in this case. As to the "option" of "attempt[ing] to 'settle and resolve' the controversy ... pursuant to HRS § 103D–703[,]" such "option" would no longer exist once a contractor has made a request for a written decision, as Koga appears to claim it made in this case. This is because HRS § 103D–703 provides that if the contract "*controversy is not resolved by mutual agreement,*" the State "shall promptly issue a decision in writing." HRS § 103D–703(c) (emphasis added). Therefore, it appears that at the time the

written decision is issued under HRS § 103D–703(c) or requested under HRS § 103D–703(f), the time to "settle and resolve" the controversy has passed.

Turning specifically to Koga's assertion that "[t]he State never adequately responded to [its] requests" that "the State [ ] make a decision on [Koga's] retainage claim when it sought the State's final acceptance of Koga's work[,]" it is not evident what specific actions the State could have undertaken that Koga would deem an "adequate[ ] respon[se]." Koga does not set forth a standard by which to determine whether the State's actions constituted an "adequate[ ] respon[se]." In this case, as discussed at length *supra,* pursuant to Koga's October 4, 1999 letter and December 2, 2004 facsimile to the State regarding the Project, the State conducted two inspections, the first within a month-and-a-half of the letter, the second within a week of the facsimile.

In regard to the first inspection, by complying with the requirements of section 105.17(B), and making a determination to withhold retainage as authorized under section 109.09(A)(3), it would appear that the State's "response" to Koga's October 4, 1999 letter was "adequate." The record also establishes that the State's second inspection disclosed non-conforming work. However, unlike the first inspection, it does not appear that the record contains a facsimile or letter addressed directly to Koga indicating that non-conforming work items remained on the punchlist. Nevertheless, the language in the Punchlist Status Update, *see supra* note 42, stated that "[b]y way of this facsimile, I'll inform Koga to recheck [an area covered in runoff]," and the fact that it appears that Sakaitini was copied on the Punchlist Status Update, is evidence that Koga did receive the Punchlist Status Update indicating that the State had determined that non-conforming work items remained on the Project. In any

---

**48.** Section 108.09 of the contract provides in relevant part that

[i]f the Contractor ... performs the work unsuitably or neglects or refuses to remove materials or to perform anew such work as may be rejected as unacceptable and unsuitable, or ... [f]or any other cause whatsoever, fails to carry on work in an acceptable manner, the *Engineer*

*will give notice in writing to the Contractor and its surety of such delay, neglect or default.*

. . . .

*The Director may, when the interests of this State so require, terminate* this contract in whole or in part, for the convenience of the State.

(Emphases added.)

event, Koga does not argue that it did not receive the facsimile, nor does it claim that any apparent failure of the State to send the facsimile to Koga establishes that the State's "response" was "inadequate." Thus, it appears that pursuant to the relevant provisions of the contract, the State responded appropriately to Koga's "requests."

### B.

 Koga also appears to contend that its two requests that the State conduct a final inspection amounted to "written request[s] for a final decision" pursuant to HRS § 103D–703(f). As to the October 4, 1999 letter, this seems to be the first communication from Koga to the State indicating that Koga was "substantially complete with the [Project]." But at that time, Koga was simply notifying the State, as it was required to do under section 105.17(B) of the contract, that the Project was complete. In this case, at the time Koga sent the State the October 4, 1999 letter, there is no evidence that a "contract controversy" in regard to the retainage existed, and therefore, the October 4, 1999 letter cannot be interpreted as falling within the meaning of HRS § 103D–703(f).

Nor does it appear that the December 2, 2004 facsimile was a "written request for a final decision." As discussed above, the December 2, 2004 Koga facsimile indicated "that items 30, 41, 50, 53, 54, 56, & 57 on the final punchlist" had been completed. During his deposition, Panem testified the punchlist was still subject to "final inspection." Although unclear, it appears that Panem was referring to purported completion of all the items on the punchlist, rather than just those noted by Koga in the December 2, 2004 facsimile. Therefore, the December 2, 2004 facsimile appears to amount to "notification from the Contractor of completion of the project," as contemplated in section 105.17(B) of the contract.

Although HRS § 103D–703(f) does not set forth requirements for the form of a "written request for a final decision," it would seem that such a request must indicate to the State that a "final decision" as contemplated under HRS § 103D–703(c) and (f) was being sought. In this case, however, construing the December 2, 2004 facsimile from Koga and Panem's deposition testimony, the December 2, 2004 facsimile only serves as "notification" under section 105.17(B) of the contract that Koga completed the Project. It does not indicate that Koga and the State had been unable to reach a "mutual agreement," and that Koga now sought the State's written "final decision" so that Koga could "initiate an action under section 661–1[,]" HRS § 103D–711.

Furthermore, "notification" that Koga had completed the Project made pursuant to section 105.17(B) of the contract cannot be interpreted as a "written request for a final decision" because the State's response to a "notification" is governed by the contract. In other words, when the State receives notice of completion of the Project, section 105.17(B) requires the State to "notify the Contractor in writing if the inspection discloses non-conforming work." Nothing in section 105.17(B) requires the State to include the information required under HRS § 103D–703(c) [49] in its "noti[ce]" to the Contractor" of non-conforming work. Because Contract section 105.17(B) and HRS § 103D–703(c) require different responses from the State, in this case, Koga's December 2, 2004 facsimile cannot be interpreted as simultaneously being "notification from the Contractor of completion of the project" and a "written request for a final decision." Therefore, it does not appear that Koga's December 2, 2004 facsimile was a "written request for a final decision" as required in HRS § 103D–703(f).

### X.

As noted above, Koga did not directly address "the issue of whether the procedure set forth in [HRS] § 103D–703 is mandatory, and thus determinative of jurisdiction in the [court]," as requested in the August 12, 2009 Order. It is concluded that because (1) it

---

**49.** To reiterate, HRS § 103D–703(c) provides that "[t]he decision shall [ ] [s]tate the reasons for the action taken; and [i]nform the contractor of the contractor's right to initiate a judicial action as provided in this part."

appears that "the procedure established in HRS § 103D–703 was the 'exclusive means available' for Koga to resolve the retainage controversy based on a breach of contract," (2) Koga did not avail itself of these "exclusive means," the court lacked jurisdiction to decide Koga's claim for retainage.

## XI.

Because the court was wrong in granting Koga's motion for partial summary judgment, the ICA gravely erred in affirming partial summary judgment to Koga. Furthermore, the ICA gravely erred in affirming the court's decision as to damages to Koga and in reversing the portion of the court's October 24, 2006 final judgment related to retainage, as the court did not have jurisdiction over the retainage claim.[50] Accordingly, the ICA's judgment is vacated, the court's October 15, 2003 Order granting Koga's motion for partial summary judgment is vacated, and the case remanded for a determination of whether the State was prejudiced by Koga's Claim. In addition, the portion of the court's October 24, 2006 final judgment regarding retainage is remanded to the court with instructions to dismiss that claim for lack of jurisdiction.

---

50. It should be noted that the State's lack of jurisdiction argument was not raised before the court or the ICA. Subsequently, Koga should be allowed to file its written request with the chief procurement officer for a final decision as to the retainage claim, as such a request was ostensibly rendered unnecessary by the court's assertion of jurisdiction over the claim. Additionally, inasmuch as the retainage amount of $145,250 arose after the suit had been filed and was litigated, and the State had already approved of $62,762.11 of that amount, no prejudice redounds to the State by such a filing.